# JERRY DENNIS v. WARDEN, MARYLAND PENITENTIARY

[No. 173, September Term, 1968.]

*Decided March 13, 1969.*

*Millard S. Rubenstein* (Roland Walker on the brief) for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert W. Baker, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

This case presents the question of the admissibility in evidence at the appellant's trial in 1959 of statements made by him during custodial interrogation.

## THE LAW

In Maryland the basic rule is that a confession is admissible if it is voluntarily made. "If freely and voluntarily given, it is admissible; if not it is inadmissible." *Taylor v. State,* 238 Md. 424, 429. This has always been the ultimate test of admissibility and it is still the crucial test. *McChan v. State,* 238 Md. 149, 158-159. The voluntariness test was followed in this State more than half a century before it was applied in State prosecutions by the Supreme Court of the United States. *Nicholson v. State,* 38 Md. 140 (1873).[1] Today the standard of voluntariness which evolved by Supreme Court decisions in state cases under the due process clause of the fourteenth amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination. *Davis v. North Carolina,* 384 U. S. 737, 740.[2] In

---

1. It was in 1936 that the Supreme Court first reviewed state convictions based on coerced confessions. *Brown v. Mississippi,* 297 U. S. 278.

2. The privilege against self-incrimination was well established in the English common law by the middle of the seventeenth century. But legal restrictions on extra-judicial confessions were sharply distinguished from the privilege. Protection under the privilege extended only to judicial proceedings and not to the questioning of suspects prior to the filing of formal charges. The first rule against involuntary confessions emerged in the English

*Brown v. Mississippi,* 297 U. S. 278 (1936) in which the Supreme Court first reviewed state convictions based on coerced confessions and in the five confession cases following [3] the rationale of the opinions was that the obtaining of the confessions violated the inherent standards of decency and fair play implicit in the due process clause of the 14th amendment. Although there was a shift in emphasis from time to time, through 1963 the Court adhered mainly to standards of voluntariness, more often emphasizing the "totality of the circumstances" bearing on the suspect's decision to confess.[4] See *Haynes v. Washing-*

common law in the eighteenth century and was formally stated in 1783:

> "A free and voluntary confession is deserving of the highest credit * * * but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected." *The King v. Warickshall,* 1 Leach 263, 168 Eng. Rep. 234, 235 (K. B. 1783).

The focus of the common law rule was the authenticity or "trustworthiness" of the confession. It was recognized in the United States as early as 1792. *Commonwealth v. Dillon,* 4 Dall. 116 (Pa. 1792), but was not formally endorsed by the Supreme Court until 1884, *Hopt v. Utah,* 110 U. S. 574, 584. In 1897 in *Bram v. United States,* 168 U. S. 532 the Court reversed a conviction for murder, holding that the confession had been involuntary but the decision was not based on the "trustworthiness" rule but on the self-incrimination privilege of the 5th amendment. However in *Twining v. New Jersey,* 211 U. S. 78 (1908) the Court rejected the contention that the privilege against self-incrimination was applicable to the states through the due process clause of the 14th amendment and it was not until 1964 that *Twining* was overruled and the position endorsed. *Malloy v. Hogan,* 378 U. S. 1. The above and other history of the Supreme Court rule as to confessions is from an article entitled "Police Interrogation and the Supreme Court: An Inquiry into the Limits of Judicial Policy Making" by Otis H. Stephens, Jr. in the *Journal of Public Law,* vol. 17, no. 2 (1968) of Emory University Law School.

3. *Chambers v. Florida,* 309 U. S. 227 (1940); *Canty v. Alabama,* 309 U. S. 629 (1940); *White v. Texas,* 309 U. S. 631 (1940); *Lomax v. Texas,* 313 U. S. 544 (1941); *Vernon v. Alabama,* 313 U. S. 547 (1941).

4. In *Rogers v. Richmond,* 365 U. S. 534 (1961) the Court explicitly rejected the rule of "trustworthiness" as the basis for de-

*ton,* 373 U. S. 503 (1963). But by *Escobedo v. Illinois,* 378 U. S. 478 the old test of voluntariness as the sole criterion of admissibility was abandoned. There the confessions were invalid, not because they were coerced, but because they were made in the absence of requested counsel and without effective warnings of the constitutional right to remain silent, the Court having decided in *Gideon v. Wainwright,* 372 U. S. 355 (1963) that an accused has the right to counsel in all criminal cases.[5] Questions left unanswered in *Escobedo* were resolved in *Miranda v. Arizona,* 384 U. S. 436 (1966).[6] It enunciated procedural guidelines and exclusionary rules if they were not followed, but it did not discard the old voluntariness test entirely.[7]

termining the admissibility of confessions in state courts under the 14th amendment. In *Davis v. North Carolina, supra,* at 739 the Court said, citing *Rogers,* "Nor are we called upon to determine whether the confessions obtained are true or false."

5. The consideration of procedural irregularity was foreshadowed in *Ashcraft v. Tennessee,* 322 U. S. 143 (1944) when Justice Hugo L. Black said for the Court that a thirty-six hour session of continuous police questioning was "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear." at 154. In his article, see note 2 *supra,* Professor Stephens says that the majority of the Court gradually expanded the protection of the due process clause of the 14th amendment by emphasizing the totality of the circumstances which surrounded each challenged confession. "Attention was focused on both the conduct of the police in their treatment of the suspect and the physical and emotional condition of the suspect himself during the process of interrogation. Increasing importance was attached to the suspect's age, education, or lack of it, his familiarity with criminal procedure, his intelligence and his general psychological condition."

6. One federal and three state cases were reviewed in *Miranda,* the Court thereby formally erasing differences in interrogation requirements in those separate jurisdictions.

7. We have discussed the procedural requirements of *Miranda* in a number of opinions. See, for example, *Robinson v. State,* 1 Md. App. 522; *Brown v. State,* 3 Md. App. 313; *Wiggins v. State,* 4 Md. App. 95. The Court of Appeals and this Court have construed *Escobedo* to hold no more than that where the suspect " * * * has requested and been denied an opportunity to consult with his lawyer and the police have not effectively warned him of his

It is clear that the rule established in this State is in accord with the voluntariness test followed by the Supreme Court. "The basic standard governing the admissibility of an extra-judicial statement is whether, considering the totality of the circumstances, the statement was voluntary * * * To be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Keller v. State,* 2 Md. App. 623, 626-627, quoting *Malloy v. Hogan,* 378 U. S. 1, 7. The holdings of *Escobedo* and *Miranda* have been impressed on this rule. However, *Escobedo* affects only those cases, the trial of which began after June 22, 1964, the date of the decision, and *Miranda* applies only to cases, the trial of which began after June 13, 1966, the date of that decision. *Johnson v. New Jersey,* 384 U. S. 719, 721. But, at the same time, even though a convicted person may not be entitled to the benefits of *Escobedo* and *Miranda* because his trial began before the date of those decisions, providing the procedural prerequisites for direct or collateral attack are met, "prisoners may invoke a substantive test of voluntariness * * *. That test now takes specific account of the failure to advise the accused of his privilege against self-incrimination or to allow him access to outside assistance * * *. Prisoners are also entitled to present evidence anew on this aspect of the voluntariness of their confessions if a full and fair hearing has not already been afforded them. * * * Thus, while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim." *Johnson v. New Jersey, supra,* at 730.

With that background we turn to the instant case.

---

constitutional right to remain silent * * *" the accused has been denied assistance of counsel and his statement made without the advice of counsel is inadmissible against him at his trial. *Jenkins v. State,* 238 Md. 451, 460; *Boone v. State,* 2 Md. App. 80, 93-94.

## THE INSTANT CASE

### History of the Case

On 15 December 1959 Dennis was found guilty by a jury in the Criminal Court of Baltimore of murder in the first degree on which a sentence of life imprisonment was imposed and of robbery on which he was given a concurrent sentence of 10 years. No appeal was taken. On 8 April 1965 he filed a petition under the Uniform Post Conviction Procedure Act and after hearings at which he was represented by court appointed counsel his petition was denied. Leave to appeal was denied as to eight grounds for relief raised by him and granted as to three: 1) that he was unconstitutionally denied counsel during his preliminary hearing at which he entered a guilty plea and that the State prosecutor, in his opening statement had so told the jury; 2) that an alleged oral confession and written statement were not voluntarily made; and 3) that he was denied a transcript of the original trial. The Court said that the transcript was to be made available to him and remanded the case as to those three grounds for the taking of further testimony and for findings of fact therein. *Dennis v. Warden,* 243 Md. 104. In conformity with the mandate of the Court of Appeals, the lower court conducted evidentiary hearings on 1 February and 24 August 1967, and on 10 October denied relief, finding that the guilty plea had not been referred to at the trial and that his statements were voluntarily made. A transcript of the original trial had been furnished Dennis. He filed application for leave to appeal. On 10 July 1968, after reviewing the transcript of the proceedings at the hearings, we agreed that there was no evidence to support the contention as to the guilty plea but we felt that the question of whether the oral and written statements made to the police were voluntary should be resolved only after the issue had been fully briefed and argued before us. We granted leave to appeal as to the question of the voluntariness, *vel non,* of the oral and written statements, denying leave to appeal on the other contentions. *Dennis v. Warden,* 4 Md. App. 548. The case was transferred to the regular appellate docket of this Court, briefs were filed on behalf of Dennis and the State and the matter argued before us. The

appellant contends that the statements were not voluntarily made and thus it was error to admit them in evidence.

The sole issue presented for review is whether the statements were voluntarily given or were the result of overbearing by police authorities.

*The Evidence at the Trial*

Sergeant Albert Kendrick of the Baltimore City Police Department testified. that Dennis had been arrested on 11 August 1959 by Officers Sticklein, Sellers and McGuire and brought by them to the Southwestern Station at 11:05 A.M. He took custody of the suspect in the Sergeant's room on the second floor. He talked to him about the murder and robbery of Lawrence North which occurred on 7 August about 10:00 P.M. Dennis said that on 7 August he went to look for a job about 8:00 A.M. He walked around until noon. He stayed around Mount and Fayette Streets and went to the house of his girl friend, Geraldine Campbell, at 8:00 P.M., staying there until 11:00 P.M. playing records and dancing. He left "came up Fayette Street to Bentalou, came down Baltimore where he went to his house at Catherine which was around midnight." Dennis was booked at 11:45 A.M. and the Sergeant sent for the girl friend. He talked to her and then talked to Dennis again at 3:20 P.M. in the Sergeant's room. The Sergeant told Dennis the girl had said that he was not at her house and that Dennis had told her to say that he was. (She told the Sergeant Dennis had not been at her house; "she was not going to be involved in it.") Dennis "started to get nervous and all and finally gave me an oral statement that he had hit the (deceased)." The statement was later reduced to writing. The written statement was started at 5:40 P.M., it was interrupted at 6:00 P.M. "for him to eat his meal, resumed at 6:30 P.M. and terminated at 7:50 P.M." In answer to specific questions by the State the witness said that neither he nor anyone in his presence used any force or violence upon the appellant, that no threats were made to him, that no promises were made to him and that no immunities were held out to him, "in order to get him to make a statement." The Sergeant was cross-examined at length on the issue of voluntariness of the statements. It was elicited that

the written statement contained the words of the appellant and nothing was omitted as far as the actual statement was concerned. Sergeant Donahue, Detective Keefer, Detective Rawlings and Officer Clark were present when the statement was made, the last typewriting it. The door to the room was closed and the statement was typed as the appellant made it, "directly to the typewriter." Only Kendrick asked questions. The appellant was able to make direct answers to every question asked him and had no difficulty in understanding and it was not necessary "to prod him a little bit or urge him on a little bit" in the middle of an answer. "He acted like he understood everything that was asked him." The statement contained the appellant's language, not what the Sergeant quoted him as saying. He did not tell the appellant "anything about the statement being used against him." The Sergeant denied that the appellant told him that when he learned the man had died "he was sick in the stomach" or that he said "he didn't realize the man was hurt that bad as to ultimately die." After the statement was typed the appellant was given the original and each person present was given a copy. The appellant read it aloud, "line for line", "after which he freely signed it." He at no time said, "that's not what my answer is." He was told when he made the oral statement that he was going to be charged with murder. Kendrick's testimony was all the direct evidence produced by the State on the issue of the voluntariness of the statements and the written statement was offered. The court asked defense counsel if there was any objection but the question was not answered. Counsel asked if the State had any further testimony on the matter. The court said the State "qualified (the statement) as to being voluntary." The defense indicated that it desired to offer evidence and the appellant was called to the stand. He had given his name and address, and his age as 18 years when his counsel said, "After due deliberation I have changed my mind and I will remove him from the stand and offer no evidence on that point at this time." Kendrick identified the written statement and it was read to the jury without objection.[8]

---

8. It appears from the record that the evidence as to the vol-

The appellant offered evidence on the question of guilt or innocence. Flossie Dennis, the mother of the appellant, said that Dennis was 18 years of age and had been living at home with five other children. His father had not been living in the home for nine years. Dennis had been in the service but she did not remember when he got out. He had been in trouble twice before. Geraldine Campbell said that the appellant left her house at 8:00 P.M. on 7 August 1959 and came back about 11:00 P.M. On cross-examination she said he saw her on 10 August and told her if the police asked to tell them he had been there all evening because he had hit a man on 7 August. The appellant said that he was eighteen years old and lived with his mother. He was honorably discharged from the army 7 October 1957. He had been convicted of fighting and tampering with an automobile after he got out of the service. He was with three other boys on the night of 7 August. The four of them drank about two and a half gallons of wine during the course of the evening. They were walking down the street, "laughing and singing * * * all of us was feeling pretty good", when this man bumped into me—"I was a couple of steps in front of the rest of them." The man said, "Why don't you watch out where you're going you black son of a bitch." Dennis testified, "When he

untariness of the statement was taken in the presence of the jury. The better practice is for the court to first hear evidence without the jury for it has the preliminary determination of voluntariness, its duty being to decide whether the *prima facie* proof was such as to establish voluntariness; the ultimate determination of voluntariness must be by the trier of fact beyond a reasonable doubt. *Barnhart v. State,* 5 Md. App. 222. But the hearing of the preliminary matter on the admissibility of a confession in the presence of the jury is not prejudicial when the confession is admitted in evidence. *Smith v. State,* 189 Md. 596, 606; *Pinto v. Pierce,* 389 U. S. 31.

A defendant's constitutional rights are violated when his *challenged* confession is introduced without the preliminary decision by the trial judge of its voluntariness after an adequate hearing. *Jackson v. Denno,* 378 U. S. 368. Even assuming that the statements of the appellant were here challenged at the time they came into evidence, we think the statement of the lower court that the State had qualified the statement as to voluntariness was a sufficient finding. We note that the testimony that the appellant said orally that he hit the deceased came in without objection.

said that I just took a punch at him. I hit him in the chin. He fell back and hit his head against the curb. I continued to walk down the street." He saw the other boys pull the man out of the street. He denied taking anything from the man and said he did not know that night the other boys had taken anything. He read in the paper the man had died and that his purse and ring were missing. He asked the other boys about it. Objection to what they told him was sustained.[9] After he learned the man had died "I was real sick. I couldn't eat. I didn't feel well * * * I couldn't sleep either." He said that when he was arrested he was questioned in the Sergeant's Room at Southwestern. "Most of the time the Sergeant would question me but if any of the others had any suggestions, well they would ask too." They did not tell him what he was charged with or that a statement could be used against him. "I knew I was there to be questioned about the man * * *." He described the interrogation procedure. "Well the Sergeant would ask me a question and when he asked me the question I would give him an answer, but when I gave him the answer he would turn the answer around to what he wanted it to be and then anyway I gave him an answer and he would say it his way and give it to the clerk and the clerk would type it down." The answers were not typed as he gave them. He said the answer in the statement containing 13 lines was not a narrative by him but the result of a series of questions. "I kept telling him, I said Sergeant that's not the way, that's not the way I said and I didn't say it and he would tell me to shut up and just answer the questions." He signed the statement—"so it wasn't nothing I could do but sign it." He said he never denied to the police that he hit the man, he admitted it. On cross-examination he admitted that he first told the police he was not even there and that he asked his girl friend to tell the police he had been at her house all

---

**9.** An eyewitness testifying for the State first saw the deceased standing on the corner. The witness looked away and heard a thump. He looked back and saw the man on the ground. A boy was on both knees going through the man's pocket and another was pulling on his arm. Two other boys were on the corner about three or four feet away while this was going on. The four boys left together.

evening to set up an alibi because he knew he was the one responsible, "in a way", for the man's death. He had been convicted of assault in June of 1958 and sentenced to six months and of tampering with an automobile in August of 1958 and sentenced to six months.

*Evidence at the Post Conviction Hearings of 17 September 1965 and 14 October 1965.*

On 17 September 1965 the appellant testified that when he was arrested the police did not advise him "of any legal right to remain silent in the face of any questions." He made a statement because "they had three witnesses, boys of about fifteen or sixteen years of age, and they asked the boys had they seen me on that particular night, and they had the boys sign a statement saying that they had * * * and they told the girl that I couldn't have possibly been around the house because they had three boys sign a statement saying I had been down Bentalou Street, coming down Bentalou Street." His counsel read to him the allegation in his post conviction petition—"his so-called 'confession' was obtained by the police by means of psychological duress which, in fact, made it an involuntary confession. That the arresting officer never advised your Petitioner of his right to remain silent, his right to an attorney, or that any statement that he made could be held against him." Asked to tell the court about that he said, "That is right. I was not advised * * * of any rights." On cross-examination he made no response to a question whether the police had threatened him in any way to obtain the statements. The transcript then reads:

"Q. Did they beat you at all?

A. No, I don't think so.

Q. Did they threaten you in any way, or did they use any physical force, or violence, on you?

A. No, they didn't use no physical force.

Q. Did they tell you things would go easier if you signed:

A. Yes, they did say things like that.

Q. What do you mean 'things like that?' What did they tell you specifically? Did they tell you they

would drop any particular charges against you?

(No response)

Q. How did they say things like that? What specifically did they say?

A. Well, like I said I admitted hitting the man.

Q. You admitted it? What did you say?

A. I said I admitted it down at the Court, that's in the central, that's the reason why I pleaded guilty.

Q. You admitted it to the police prior to your pleading guilty at the Magistrate's hearing, is that correct, and that's why you pleaded guilty?

A. Right.

Q. Did they offer you any inducement in order to get you to make this statement? Did they tell you they were going to go easier on you, you were going to get a lesser term? What did they say to you?

A. One policeman said—I don't remember his name—he said it would be better if I cooperated. * * * One policeman said—I don't remember his name—he said it would be better if I cooperated with him.

By Mr. Baker (Assistant State's Attorney):

Q. Did you understand the statement?

A. I don't know if I did, or not. I seen it, but I didn't get a chance to read it real thoroughly.

Q. Prior to your giving the statement, had you at any time requested to have an attorney?

A. Not then because they told me they was holding me for investigation.

Q. So, you hadn't requested an attorney then?

A. No.

Q. Did you request to make any telephone calls?

A. Yes.

Q. Didn't they allow you to make these telephone calls?

A. No, sir.

Q. Who did you want to call?

A. I wanted to call home.

Q. What time was this?
> (No response)

Q. When did you make this statement? What day?

A. I can't remember the exact day, but I know it was the 10th or the 11th, something like that.

Q. Well, you were arrested on the 10th, or the 11th. Was it the same day you were arrested that you made the statement?

A. The next day.

Q. The next day?

A. Yes.

Q. What time were you arrested?

A. It was in the morning about 9:30.

Q. What time did you make the statement on the next day?

A. I think it was somewhere around noon, or later that evening.

Q. Had they questioned you prior to that time?

A. Yes, sir.

Q. Was there anybody in your presence, when they questioned you about any of the three boys you are talking about?

A. No."

The hearing was continued to afford the opportunity, among other things, to obtain the appearance of the police officer to testify "whether or not the statement was voluntarily given." But at the hearing on 14 October 1965 no evidence was produced on the point, nor was it mentioned or argued.

*Evidence at the Hearing of 1 February 1967 and 24 August 1967*

The appellant testified that on Tuesday morning, 11 August 1959, three police officers came to his house and told him they would like to take him to the Southwestern Police Station for investigation. He was placed in a room. Sergeant Kendrick asked him a few questions about his whereabouts on 8 August and then came back and asked about 7 August. "So I told him where I was on both nights." The Sergeant talked to him for

a while, took him to the cell block and later came to get him. The transcript reads:

"When he came to get me later, he had people standing outside and were asked had they seen me before that—After he came to get me later he took me back downstairs and placed me in another room. Before I got to the room outside people were pointing me out and saying, 'He's the one, yes, he's the one that did it', and this sort of thing.

After I was taken into the room, he sat down and told me, 'All right, Dennis, come clean with me, come clean with me as you can, you were not where you said you were on Friday, the 7th of August, and we got witnesses, so let's have it.'

At that time, being real young I was scared with all the police officers around me and they were hollering, and whatnot. At this particular time, from the attitude I felt they were not going to turn me loose like they said they would when they first picked me up for investigation, so I told them that I would like to see my mother, either my mother or somebody. So they told me, 'Just shut up,' all they want to know is what happened that night. So I told them on this particular night that me and some fellows were drinking and singing, and we had been down to this girl's house at this time.

So the officer, he told me, he said, well, there was a different story, and I wasn't at these girls' houses there like I said I was, and she said she hadn't seen me at the time the crime was supposed to have taken place.

He also had some witnesses that he brought before me—no, he took me back downstairs first again—no, he asked the witnesses he brought before me, there were three boys, one named Buffington, one Lessane, the other boy's name was Johnny Kerr, and all three of them signed statements saying they had seen me this particular night. Since they had signed statements

against me saying they had seen me this particular night, and the officers, they said this and they said that, I admitted to being the man at that particular time.

The officers kept telling me, 'You might as well come clean with us, come clean with us,' so I admitted hitting the man, but that's the only statement I gave."
He later signed a written statement, typed by a clerk:

"Well, the sergeant—they were asking questions and I would answer the questions, but when the sergeant asked me questions and I answered them, in other words he would repeat the questions to the clerk and the clerk would never type the question as I answered it, he only typed the answer where the sergeant repeated it to him. * * *

Between the oral statement and the written statement, at that time one officer—I don't know his name —he told me, he said, he asked me to cooperate, he said 'You could be cooperative, we know that you did it, we have witnesses that saw you,' he said, 'If you will be cooperative we will see what we can do for you.' * * *

I don't remember the officer's name. He told me, he said, 'Well, come on, Jerry.' He said, 'I got a kid home myself.' He said, 'I know you are scared,' and so forth and so on, 'But we aren't going to hurt you or bother you, all we want you to do is to be a little cooperative, we know you hit the man.'

At this particular time the girl who I was going with was in one room and she was crying, and whatnot, and it had some effect on me.

So then when I started giving the written statement, the written statement wasn't the way I gave it, it was turned around. * * *

Like I said at that time, I really didn't want to give any statement and I wanted to see somebody to talk to. * * *

I wanted to see my mother, she was the only one

that could help me, she was the only one that was close enough to me, to help me. My mother later said she had gone to Southwestern police station that evening but they wouldn't let her see me, they were holding me for investigation, but I wasn't held for investigation at that time because at that time they had decided they were not going to release me. They didn't inform me not to talk or anything, they did everything they could to persuade me to talk. But they didn't tell me that if I should talk at that time——."

Asked if any police officer told him that anything he said could be used for or against him in a court of law, he said:

"No, sir. Like I said, when I told them before they used these boys to point me out, and they told the boys several times, warned me they had seen me, and so forth, and so on, this was their method in trying to get me to talk, and the transcript also started off saying I started to weaken.

This is what he employed at this particular point. When he used all these things, the boys and the statement, and tried to get a confession from me and my girl friend, when she was crying like everything and asking me to cooperate and everything, this is the point when I started to weaken."

He replied in the affirmative to a question, "You feel that the police officers used improper motives of persuasion to get you to give that statement, is that right?" Asked if he ever suggested to any police officer that he wanted an attorney or wanted to talk to an attorney before he said anything or made a statement of any kind, he said:

"Well, when I said I wanted to see my mother, this is what I wanted to see her about. I did not have the funds at the time to get an attorney, but I believed she would get an attorney for me, that I wasn't allowed to. That's the purpose of seeing my mother."

That was all he had to tell the court about the statements. On cross-examination he said that Sergeant Kendrick was present

during the entire interrogation; he was the one who took both the oral and written statements. He was the one Dennis told he wanted to call his mother, although he never mentioned that he wanted his mother to get an attorney and never told him he would like to have a lawyer. "I recognized the seriousness of the offense, and I recognized they were not going to appoint me counsel and I needed some help." That was his purpose in asking for his mother. He admitted he told the officer at first that he had been with Geraldine Campbell the night of the crime. No one beat him or hit him nor did they "rough" him up at all. "Like I said at that particular time, knowing the seriousness of the offense, I was pretty scared of police officers."

Sergeant Albert Kendrick, who had retired since the original trial, testified in behalf of the State. He said that he conducted the entire interrogation. When Dennis was brought into the police station he asked him his whereabouts on 8 August and then 7 August. When he said he had been with Geraldine Campbell he questioned her and "she gave me an entirely different story * * * refuting the points as far as Jerry Dennis' whereabouts. After getting that information I had Jerry Dennis brought up to me again to the room that I had been using and confronted him "with the facts that I had received from Miss Campbell, and then he says, 'Well, I'll tell you,' or words to that effect. He said, 'I'll tell you the truth.' Nothing was even asked of him at that time. So I asked him if he would make a statement and he said yes, and at that time I had one man working the typewriter, I can't recall his name, I think it was Officer Clark. * * * Then Sergeant Donahue was allowed to remain in the room and two officers from the Homicide Squad were also allowed to remain in the room. I was the only one that asked the questions and nobody else had anything to say to him. I proceeded to take the statement by asking questions and whatever answers he gave were put down on the typewriter by the officer who was typing the entire statement." Kendrick expressly denied that the three boys whom Dennis said confronted him were present in the station house on the day he was arrested and gave the statement. He expressly denied that prior to the time either the oral or written statement was given that Dennis had asked to call his mother or asked to call any-

one who could advise him what to do. He expressly denied that Dennis asked to call an attorney and that anyone came to the station to see Dennis. He said he had not given orders that "if anyone came to the station that they would not be allowed to see Mr. Dennis." To his knowledge no one asked to see Dennis. "I would have been apprised of the fact of anything pertaining to this case whether I was there or not * * * I was the commanding officer in the case." The transcript reads:

"Q. Did you at any time tell Mr. Dennis that he should cooperate with the police, and if he did, to the effect—

A. No, I can't recall any such thing.

Q. (Continuing)—that things would be easier on him?

A. No, I can't recall any such thing. I would never use that term anyway.

Q. Did you make reference to the fact that you had a son about his age, and that you understood the position he was in at the time you were taking his statements?

A. No, absolutely not.

Q. While you were present, and while the interrogation was going on, were you or the other officers, or were you and the other officers screaming and hollering at him?

A. No, absolutely not.

Q. How long were you on the police force prior to 1959?

A. Well, I was a detective for sixteen years and I was a sergeant for nine years; twenty-five years all told.

Q. I would assume during the course of that period you had participated in a good number of statements?

A. Absolutely.

Q. Would you say in your opinion that those statements were freely and voluntarily given by Mr. Dennis?

A. I would, yes, sir.

Q. And would you say also that there was no par-
ticular form, or psychological coercion or actual
threats made to him?

A. No, none whatsoever."

Sergeant William Rawlings testified in behalf of the State. He was present during the time the statement was given. In his presence Dennis did not ask to see his mother or request that someone "advise" him or to see a lawyer before he gave a statement. Nor did anyone in his presence physically abuse Dennis or make any inducements to him nor did Kendrick make reference to the fact that he had a son approximately the same age as Dennis, "that he understood how Jerry Dennis may have felt at that time and if he would come clean it would go easier with him."

At the resumption of the hearing on 24 August other counsel had been appointed to represent Dennis. Mrs. Flossie Dennis, the appellant's mother testified in his behalf. She said when she learned her son had been taken to the police station she went there and asked the man on the desk if she could see her son. She was told she could not see him, that he was not charged with anything and that they could hold him for 72 hours for investigation. She went back that afternoon and was told by the man on the desk that she could not see him and left two packs of cigarettes for her son. She later saw him at the City Jail and asked him if he had signed a statement and he said he had because the police officers "said they had papers and notes * * * that some boys had given them statements or something." She employed a lawyer for him.

Ferdinand Lessane, one of the boys questioned by the police about the crime, who at the time was "just under sixteen" and who at the time of the hearing was incarcerated in the Maryland House of Correction on a three year sentence for assault, said he and a Tom Brown were taken to the Southwestern Police Station in August 1959. The police told him they had a statement from Jerry Dennis. After questioning him they told him he was not the one they wanted. He gave no written statement—"They produced a written statement but I didn't see any signature on it." He said the police took him and Brown to a

room where Dennis was and asked if he knew him. He told them he had known Dennis five or six months and they took him back to the cell block. He was in the presence of Dennis on two separate occasions that day.

*The Application of the Law to the Facts*

Dennis has now received full and fair hearings at which he invoked a substantive test for voluntariness of his statements and presented evidence on the issue. While the general rule is that the determination of admissibility of a confession is left largely to the trial court, and will not be disturbed unless there is a manifest abuse of discretion, *Cooper v. State,* 1 Md. App. 190, it is our duty on review to examine the entire record and make an independent determination of the ultimate issue of voluntariness. *Davis v. North Carolina, supra,* at 741-742. As is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict here in the testimony as to the events surrounding the interrogations. But we are not a finder of facts; the weight to be given evidence and the credibility of witnesses are matters for the lower court. *Gibson v. State,* 4 Md. App. 222. Here there was evidence, which if believed, was sufficient for the hearing court to determine that the appellant had not requested and been denied counsel prior to the interrogation or requested the presence of an attorney at the questioning, that he had not asked to call his mother or anyone else to "advise" him prior to giving the statements, that his mother had not attempted to see him before the statements were obtained and been prevented from doing so, that he had not been confronted by the three boys or their statements as he alleged or that no one had pointed him out saying, "He's the one, yes, he's the one that did it," that an officer did not tell him, "if you will be cooperative we will see what we can do for you" or be "easier on you", that Geraldine Campbell was not where he could hear her crying so as to have "some effect" on him and that the written statement was as he gave it and not "turned around." See *Smith v. State,* 4 Md. App. 146; *Harris v. State,* 1 Md. App. 318. We believe it inherent in the determination of the hearing court as to the voluntariness of the statements that it so found. It was undisputed that no physical force was used

on the appellant, that no threats were made to him and that no inducements or promises, other than the claim that if he would cooperate "we will see what we can do for you," were given him. We think it also clear that the substance of the warnings now required by *Miranda* were not given him. Had the trial come after that decision we would be obliged to reverse summarily, but as it did not the *Miranda* requirements are not directly applicable, although relevant on the issue of voluntariness. Nor did the trial begin after the decision in *Escobedo,* so its holdings are not applicable.

On this factual posture,[10] our examination of the entire record leads us to the conclusion that the statements were not the product of a will overborne, considering the totality of the circumstances. The appellant's faculties were not impaired by inadequate sleep and food, sickness, and long subjection to police custody as in *Clewis v. Texas,* 386 U. S. 707. There was no intermittent interrogation for a number of days by teams of police officers as in *Davis v. North Carolina, supra,*[11] nor contin-

---

10. In *Payne v. Arkansas,* 356 U. S. 560, the Supreme Court said, at 562, that the findings of fact of state courts, "fairly made upon substantial and conflicting testimony as to the circumstances producing contested confessions—as distinguished from inadequately supported findings or conclusions drawn from uncontroverted happenings—are (generally) not this Court's concern." But its duty is to determine from its own examination of the record whether the confession was coerced. "The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both." *Lisenba v. California,* 314 U. S. 219, 237-238.

11. The undisputed facts were that Davis, an impoverished Negro with a third or fourth grade education, was questioned for 16 days, held incommunicado for that period, provided only a limited diet (he lost 15 pounds), questioned several times a day, made to walk 14 miles on railroad tracks handcuffed to an officer to break down his alibi and driven to the scene of a murder, a cemetery, and questioned about it. Finally, on the sixteenth day, it being observed that he had been reading a testament, he was left alone with one officer who asked him if he had been praying. He said he did not know how to pray and agreed he would like the officer to pray for him. The officer offered a short prayer. "The prayers of the police officer were answered—Davis confessed." A police captain dictated the statement, employing his own choice of format, wording and content. The confession was held to be the involuntary end product of coercive influences. 384 U. S. 742-752.

uous questioning for 36 hours as in *Ashcraft v. Tennessee, supra.*

In *Haynes v. Washington, supra,* it was not contradicted that the accused was told he could call his wife only after he confessed. In *Lynumn v. Illinois,* 372 U. S. 528, the police threatened the accused by telling her, while she was surrounded by three police officers and a twice convicted felon, that state financial aid would be cut off and her children taken from her if she did not "cooperate" and she had no previous experience with the criminal law. In *Culombe v. Connecticut,* 367 U. S. 568, the accused had a mental age of nine and one-half years, was suggestible and subject to intimidation, was detained in effective custody of police four nights and a substantial portion of five days during which he was repeatedly, although intermittently, questioned and was not brought before a magistrate with reasonable promptness as required by state law. In *Reck v. Pate,* 367 U. S. 433, the confessor was a 19 year old youth of sub-normal intelligence who confessed after he was confronted with confessions of his companions after being subjected to long stretches of interrogation while held incommunicado and was physically weakened and in intense pain. In *Blackburn v. Alabama,* 361 U. S. 199, the evidence indisputably established the strong possibility that the defendant was insane and incompetent at the time he confessed and the confession was the result of eight or nine hours of sustained interrogation in a tiny room on occasion literally filled with police officers and in absence of friends, relatives or legal counsel. In *Payne v. Arkansas,* 356 U. S. 560, the defendant was a mentally dull 19 year old Negro youth, arrested without a warrant, who was denied a hearing before a magistrate as required by state law, was held incommunicado for three days without counsel, whose family had been denied permission to see him, who was refused permission to make a telephone call, denied food for long periods and told "there would be 30 or 40 people there in a few minutes that wanted to get him" which statement created such fear as immediately produced the confession. In *Fikes v. Alabama,* 352 U. S. 191, an uneducated Negro of low mentality, if not mentally ill, was removed after arrest to a state prison far from his home without being taken before a magistrate as

required by Alabama law, kept in isolation except for sessions of questioning lasting several hours at a time, and his father and lawyer were prevented from seeing him before he confessed. Of course, whether or not a confession is voluntary depends on the facts of each case, *Cooper v. State, supra,* but we refer to the above cases as examples where the "totality of the circumstances" led to a conclusion that a confession was involuntary as obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities.

In the instant case the appellant was 18 years of age. See *Wiggins v. State, supra,* 106. It was not shown or alleged that he was not of average intelligence. He had a 10th grade education. He had served in the army and received an honorable discharge. He had previous experience in the criminal law. He admittedly was not physically coerced into confessing. He was not subjected to prolonged and sustained interrogation for days or even hours. He was not denied food. He was first questioned briefly shortly after his arrest as to his whereabouts and attempted to establish an alibi. Interrogation was stopped, he was placed in a cell and an attempt was made to verify the alibi. It was found to be untrue. The afternoon of his arrest he was confronted with that fact. Faced with the knowledge that the police knew he had lied about his whereabouts at the time of the murder, he admitted he had hit the deceased and then gave a detailed statement, typed as he gave it. He had not been confronted with statements of other co-defendants implicating him, see *Johnson v. State,* 2 Md. App. 235, and was not subjected to "psychological duress" or improper persuasion. In our independent examination of voluntariness we have considered the failure to advise the appellant of his right to remain silent and of his right respecting counsel at the outset of interrogation, as now required by *Miranda,* as a significant factor. But, in the totality of the circumstances here, we could find that the statements were involuntary only on the ground of that failure and not by considering it as one relevant factor of all the attendant circumstances. We do not think that the decisions of the Supreme Court or the decisions of the State compel such conclusion. If the Supreme Court so intended, it would not have ruled that *Miranda* and *Escobedo* are to be applied prospectively. On

the contrary, it said in *Johnson v. New Jersey, supra,* 731, referring to the failure to warn accused persons of their rights, or the failure to grant access to outside assistance, "Prior to *Escobedo* and *Miranda,* however, we had expressly declined to condemn an entire process of in-custody interrogation solely because of such conduct by the police. * * * Law enforcement agencies fairly relied on these prior cases, now no longer binding, in obtaining incriminating statements during the intervening years preceding *Escobedo* and *Miranda."*

It may well be that Dennis was "scared" as he said. But he realized that he had been responsible for the death of a man and he testified at the original trial that before he was apprehended he was "real sick * * * I couldn't eat. I didn't feel well * * * I couldn't sleep either" when he learned the man had died. Even if the hearing court believed that he was "scared", his testimony did not compel a finding that his condition was caused by any improper action by the police. See *Wiggins v. State, supra,* 199.

We find no coercion from any practice by the police which had the effect of controlling Dennis' will. We hold that the statements were voluntarily given.

In so holding we are not unmindful that the confession of one of Dennis' co-defendants, John Ledbetter, who like Dennis, had confessed to his involvement in the crime, was found involuntary by the United States District Court for the District of Maryland following an evidentiary hearing upon a petition for a writ of *habeas corpus,* that court ordering, in the alternative, a retrial or Ledbetter's release. *Ledbetter v. Warden,* 239 F. Supp. 369. The judgment was affirmed by the United States Court of Appeals for the Fourth Circuit, 368 F. 2d 490, and the Supreme Court denied certiorari, 386 U. S. 971. But as the Court of Appeals said in *Dennis v. Warden,* 243 Md. 104, 109: "The determination of the Federal District Court that Ledbetter's statement was involuntary is not determinative of the voluntariness of Dennis' statements." We do not find *Ledbetter* to be factually apposite to the instant case in any event. The Federal District Court conducted a full evidentiary hearing.[12] As

---

12. Ledbetter appealed his conviction and the judgment was

with Dennis, Ledbetter had not been advised of his constitutional rights and did not waive them, but the federal court found, as a fact, on conflicting evidence before it, that Ledbetter did ask permission to telephone his family, his aunt and uncle with whom he lived and who later obtained a competent attorney for him and that the request had been made and denied before the damaging admissions were made. And the testimony also showed that Ledbetter, who was brought into the Police Station while the statements of Dennis were being obtained, was later read the statement just given by Dennis and agreed with it in general. He then gave his own signed statement. The United States Court of Appeals in its opinion noted that this was Ledbetter's first serious encounter with the police, that he was alone in the hands of the police and that his requests to contact his family were refused. "When Ledbetter was refused permission to make a phone call he knew full well that the police intended to hold him *incommunicado* and pursue their interrogations until they would bear fruit. * * * the production of the co-suspect's implicating statement coupled with the denial of access to the telephone, made it clear to Ledbetter that he could gain respite only by confirming the statement." 368 F. 2d 492. This was not the situation in the instant case.[13]

*Judgment affirmed.*

___

affirmed. *Ledbetter v. State,* 224 Md. 271. The question of voluntariness of the confession was not presented. He filed a petition for relief under post conviction procedures raising the issue. No testimony was taken and relief was denied, the lower court concluding that the question of the voluntariness of the confession could not be raised in a post conviction proceeding. The Court of Appeals disagreed with that conclusion but denied relief noting that the voluntariness of confession had not been contested at the trial and his confession had been admitted in evidence without objection. *Ledbetter v. Warden,* 234 Md. 643. Thus until the proceeding in the federal court there had been no determination of the voluntariness of the confession on the merits upon a full and fair hearing and no findings of fact thereon.

13. We cannot help but observe the apparent attempt by Dennis in his testimony at the hearing of 1 February 1967 to conform his allegations with the findings of fact, discussions and holdings in *Ledbetter v. Warden,* 239 F. Supp. 369, decided 18 March 1965 and *Ledbetter v. Warden,* 368 F. 2d 490, decided 22 September 1966.