496 A.2d 1074

Jackie Kevin HARRIS

v.

STATE of Maryland.

No. 107, Sept. Term, 1984.

Court of Appeals of Maryland.

Sept. 9, 1985.

Michael R. Braudes, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender and George E. Burns, Jr., Asst. Public Defender, Baltimore, on brief), for appellant.

Deborah K. Chasanow, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ORTH, Judge.

## THE HISTORY OF THE CASE

Jackie Kevin Harris is incarcerated in the Maryland Penitentiary under a sentence of death. He entered pleas of guilty in the Circuit Court for Baltimore County to murder in the first degree, two counts of armed robbery and a handgun violation. The pleas were accepted and he was found guilty on all counts. On 5 April 1982, after a sentencing proceeding as prescribed by Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 413, the trial judge imposed the death penalty for first degree murder and consecutive sentences of imprisonment totalling 20 years for the related offenses. In *Harris v. State,* 299 Md. 511, 513–514, 474 A.2d 890 (1984) (*Harris II*), Eldridge, J., speaking for the Court, recounted what happened on appeal from those judgments.

... Harris raised numerous grounds for reversal of his guilty verdicts and sentences. He claimed, *inter alia,* that his guilty pleas were not made voluntarily, that he was denied effective assistance of counsel, and that his waiver of a jury for sentencing was not knowing and voluntary. [In *Harris v. State,* 295 Md. 329, 455 A.2d 979 (1983) (*Harris I*) w]e ruled that Harris's guilty pleas were made freely and knowingly, Maryland Rule 731 c., but that his jury waiver was not knowing and voluntary. We did not pass on the ineffective assistance of counsel claim because we believed that it would best be resolved in a collateral evidentiary proceeding such as a post conviction hearing. Accordingly, this Court affirmed the verdicts but vacated the death sentence and remanded for

a new sentencing procedure. *Harris II* [299 Md.] at 513–514, 474 A.2d 890.

On the remand pursuant to *Harris I*, prior to the resentencing proceeding, Harris, then represented by new counsel, filed a motion in the circuit court under Maryland Rule 731 f.1. to withdraw his pleas of guilty.[1] The motion was based on the grounds that the pleas were involuntary under the standards of Md.Rule 731 c., and that they were entered without the effective assistance of counsel. The trial judge denied the motion without a hearing on the merits. A sentencing proceeding with respect to the first degree murder conviction was then held before a jury, which determined that the death sentence was to be imposed. The judge imposed it.

The trial judge gave two reasons for denying the motion to withdraw the guilty pleas. First, he believed that our ruling in *Harris I* that the pleas were voluntary with respect to Rule 731 c. was conclusive as to the law of the case. He was correct in this belief. Second, he thought that a proceeding under the post conviction statute, Md. Code, Art. 27, § 645A, was the sole means of determining an ineffective assistance of counsel claim. We have expressed the view that a post conviction proceeding is the preferable route for raising such a claim, *see Johnson v. State,* 292 Md. 405, 434–435, 439 A.2d 542 (1982), quoting *State v. Zimmerman,* 261 Md. 11, 24, 273 A.2d 156 (1971). But we held in *Harris II* that in the circumstances of this case, the judge was mistaken in concluding that he could not hear the incompetency of counsel claim on the merits. On Harris's appeal from this denial of his motion, we observed that we were "presented with a unique set of facts which justifie[d] resolution of the ineffective assistance of counsel claims in a proceeding other than one under

---

1. Maryland Rule 731 f.1., as rewritten by Rule 4–242(f) with changes only as to style, provides: "At any time before sentencing, the court may permit a defendant to withdraw a plea of guilty ... when the withdrawal serves the interest of justice."

the post conviction procedure statute." *Harris II* [299 Md.] at 518, 474 A.2d 890. "[I]t is desirable," we opined, "for the trial court to resolve the claims of counsel incompetency in a Rule 731 f.1. proceeding instead of delaying the matter until a post conviction application is filed." *Id.* We vacated the circuit court's order denying the motion, and remanded the case for an evidentiary hearing on the competency of counsel issue. On remand, the court, in compliance with our mandate, conducted a plenary hearing. The motion to withdraw the guilty pleas was again denied. Harris's appeal from that judgment is now before us.

The present posture of the case is that Harris stands convicted of murder in the first degree, two robbery offenses and a handgun violation.[2] The sentences imposed on the convictions following the remand mandated by *Harris I* are in full force and effect. Harris's contention on this appeal is that the trial judge erred in finding that he had not been denied the effective assistance of counsel with respect to the convictions and, therefore, the denial of the motion to withdraw the guilty pleas was erroneous.

In *Harris II*, when we remanded the case for an evidentiary hearing on the motion, we explained:

> We shall not disturb our previous affirmance of the verdicts, and those verdicts shall remain intact unless and until the circuit court, after the hearing, determines that Harris was denied his constitutional right to the effective assistance of counsel. If the circuit court finds that Harris was denied such constitutional right, the court should permit the guilty pleas to be withdrawn, should set aside the verdicts and sentences on the murder, robbery, and handgun charges, and should promptly schedule a new trial on these charges. If, on the other hand, the circuit court concludes that Harris was not denied his constitutional right to competent legal representation, it should deny the motion to withdraw the guilty pleas. We

---

**2.** The remaining counts in the indictment were nol prossea.

shall then review the death sentence as we are required to do by statute. *See* Art. 27, § 414(a). *Harris II* at 519, 474 A.2d 890.

## THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

The target of Harris's ineffective assistance of counsel claim is G. Darrell Russell, Esq. Russell's background and experience may be gleaned from his testimony transcribed in the record before us. He was graduated from the University of Baltimore Law School in 1967 and was admitted to the Maryland bar in 1969. He was a law clerk for a judge of the Circuit Court for Baltimore County. He worked for two law firms as counsel in "general litigation." He was an Assistant Attorney General for four years. His primary responsibility in that position was representing the State Accident Fund, but he was also the prosecutor "for licensing and regulations" and wrote a criminal brief "every six weeks or so." At one time, as an Assistant Attorney General, he was a "chief juvenile law consultant and wrote the opinions for juvenile law." He went into private practice. He became "a full time member of the staff of the Public Defender" for Baltimore County in June 1978, but maintained his private practice. He served as an Assistant Public Defender for four years. In that capacity, up to the time he appeared as Harris's attorney, he had tried some 1,000 criminal cases in the circuit court, but only about 12 of them were jury trials. Only six or eight of all the cases he tried were murder cases and, to the best of his recollection, four of them were first degree murder cases. He resigned his position as an Assistant Public Defender in July 1982 to run for the office of State's Attorney for Baltimore County.

Russell, as an Assistant Public Defender for Baltimore County, entered his appearance as Harris's counsel shortly after the indictment was returned. He withdrew from the case at the time the first appeal was noted. It is his performance during the period of his representation that is

critical on this appeal. This is so because Harris's claim is one of "actual ineffectiveness." The Sixth Amendment to the Constitution of the United States, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *Argersinger v. Hamlin,* 407 U.S. 25, 27, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *State v. Renshaw,* 276 Md. 259, 264, 347 A.2d 219 (1975). "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Thus, the right is denied, for example, when a defendant is not afforded the opportunity to have the assistance of counsel, whether retained or appointed, or when there is governmental interference with the ability of counsel to make independent decisions about how to conduct the defense. "Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.... ' " *Strickland v. Washington,* 466 U.S. 668, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "Actual ineffectiveness" is the basis of Harris's claim.

Prior to *Strickland* the Supreme Court had not elaborated on the meaning of the constitutional requirement of effective assistance of counsel in cases presenting claims of "actual ineffectiveness." In *Strickland* the Court gave meaning to the requirement. It took the purpose of the requirement—to ensure a fair trial—as the guide. It declared:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.,* 104 S.Ct. at 2064.

Harris evaluates the performance of Russell by the standards enunciated in *Strickland,* and concludes that Russell

was so incompetent as to violate the Sixth Amendment right to counsel.[3]

We shall examine Harris's ineffectiveness claim under the totality of the circumstances, with due regard to the evidence available to the State, what Harris told Russell, and the part played by Harris in planning the tactics and strategy of the defense. We shall evaluate Russell's performance by applying the teachings of *Strickland*.

## I

### *The Teachings of Strickland*

■ There are two components to a convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or a death sentence.[4] The defendant must show that:

---

**3.** Article 21 of the Maryland Declaration of Rights declares "That in all criminal prosecutions, every man hath a right ... to be allowed counsel...." This Court has not distinguished between the right to counsel guaranteed by the Sixth and Fourteenth Amendments and the right provided by Art. 21 of the Maryland Declaration of Rights. *See Rutherford v. Rutherford*, 296 Md. 347, 357–358, 464 A.2d 228 (1983); *Utt v. State*, 293 Md. 271, 274–275, 443 A.2d 582 (1982); *Williams v. State*, 292 Md. 201, 217–218, 438 A.2d 1301 (1981); *Thompson v. State*, 284 Md. 113, 122–123, 394 A.2d 1190 (1978).

Counsel representing Harris on this appeal notes in his brief that he "perceives no substantial difference between *Strickland [v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] and the law of Maryland on this issue." He cites *Jones v. Warden*, 244 Md. 720, 721, 224 A.2d 274 (1966) and *Ward v. State*, 52 Md.App. 88, 90, 447 A.2d 101 (1982) with respect to the Maryland law prior to *Strickland*.

**4.** In this respect the Court did not distinguish between a trial and a capital sentencing proceeding like Florida's which

is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision. *Strickland* at 2064.

Florida's sentencing proceeding in capital cases is similar to that of Maryland in many significant aspects. *Compare* Fla.Stat.Ann. § 921.-141 (West 1973, Supp.1983) *and* Md.Code (1957, 1982 Repl.Vol.) Art. 27, § 413.

(1) counsel's performance was deficient, *and*

(2) the deficient performance prejudiced the defense. The defendant must make both showings. Otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 2064. *Strickland* suggested that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 2069–2070. The Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course shall be followed." *Id.* at 2070. Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact. *Id.*

(a)

*The Deficiency Component*

*Strickland* mentions several particular duties which derive from counsel's function as an assistant to the defendant in addition to "the overarching duty to advocate the defendant's cause." *Id.* at 2065. Counsel has a duty to

(1) consult with the defendant on important decisions;

(2) keep the defendant informed of important developments in the course of the prosecution;

(3) bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process;

(4) make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. *Id.* at 2065–2066.

The Court cautioned: "These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance." *Id.* at 2065.

(i)

## The Defendant's Burden

■ There is, however, a heavy burden on the defendant to establish the deficiency. He must:

(1) identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment; [5]

(2) show that his counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment—that, considering all the circumstances, the representation fell below an objective standard of reasonableness; [6]

(3) overcome the presumption that, under the circumstances the challenged action *might* be considered sound trial strategy.

*See Strickland* at 2064–2066.

(ii)

## The Function of the Reviewing Court

■ When a claim is based upon a violation of a constitutional right it is our obligation to make an independent constitutional appraisal from the entire record. *Davis v. North Carolina,* 384 U.S. 737, 741–742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Watson v. State,* 282 Md. 73, 84, 382

---

**5.** *See United States v. Cronic,* 466 U.S. 648, ——, 104 S.Ct. 2039, 2051, 80 L.Ed.2d 657 (1984): "[A defendant] can ... make out a claim of ineffective assistance ... by pointing to specific errors made by trial counsel."

**6.** *Strickland v. Washington* said, "[T]he proper standard for attorney performance is that of reasonably effective assistance," 104 S.Ct. at 2064, that is, "simply reasonableness under prevailing professional norms," *id.* at 2065. The Court explained:

Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.,* ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. *Id.*

A.2d 574, *cert. denied,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978). But this Court is not a finder of facts; we do not judge the credibility of the witnesses nor do we initially weigh the evidence to determine the facts underlying the constitutional claim. It is the function of the trial court to ascertain the circumstances on which the constitutional claim is based. So, in making our independent appraisal, we accept the findings of the trial judge as to what are the underlying facts unless he is clearly in error. We then re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed. *Walker v. State,* 12 Md.App. 684, 691–695, 280 A.2d 260 (1971); *Dennis v. Warden,* 6 Md.App. 295, 315, 251 A.2d 909, *cert. denied,* 255 Md. 740 (1969).

*Strickland* details the nature of the inquiry to be made by a reviewing court upon its independent appraisal with respect to an ineffectiveness claim. 104 S.Ct. at 2065–2066. It then summarizes the standards it established. *Id.* at 2066. We break them down as follows:

(a) [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.[7]

(b) The court must then determine whether, in light of all the circumstances, the acts or omissions identified by the defendant were outside the wide range of professionally competent assistance.

(i) In making that determination, the court should keep in mind that counsel's functions, as elaborated in pre-

---

7. *Strickland v. Washington* said that the reviewing court in its scrutiny of counsel's performance must reconstruct the circumstances of his alleged conduct and evaluate that conduct from his perspective at that time, eliminating all the distorting effects of hindsight. "It is all too tempting," the Court said, "for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 104 S.Ct. at 2065.

vailing professional norms, is to make the adversarial testing process work in the particular case.

(ii) At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.[8]  *Id.*

## (b)
## *The Prejudice Component*

■ The prejudice component "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  104 S.Ct. at 2064.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . .  [A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 2067.  Except for conflict of interest claims, there is no presumption, conclusive or rebuttable, that the defense was prejudiced by reason of counsel's deficient performance.

## (i)
## *The Defendant's Burden*

■ The general requirement is that "the defendant affirmatively prove prejudice."  *Id.*  "Even if a defendant

---

8.  The Court recognized certain practical aspects with regard to the standards it enunciated:

 The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges.  Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense.  Counsel's performance and even willingness to serve could be adversely affected.  Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.  *Strickland v. Washington,* 104 S.Ct. at 2066.

shows that particular errors of counsel were unreasonable, ... the defendant must show that they actually had an adverse effect on the defense." *Id.* It is not enough for the defendant to show that the errors had *some conceivable effect* on the outcome of the proceeding, or that the errors *impaired* the presentation of the defense. Nor is the standard that counsel's deficient conduct *more likely than not* altered the outcome in the case appropriate. The defendant must show

> that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. 104 S.Ct. at 2068.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### (ii)
### The Function of the Reviewing Court

■ In assessing prejudice "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Strickland* at 2068. The possibility of arbitrariness, whimsy, caprice, "nullification" and the like must be excluded as must the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Those factors are irrelevant to the prejudice inquiry. *Id.*

The legal standard adopted by the Court in assessing the prejudice from counsel's errors defines the questions to be asked for the assessment. With respect to the prejudice component, when a defendant challenges a conviction the question is

> whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *Id.* at 2069.

When a defendant challenges a death sentence, the question is

whether there is a reasonable probability that absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Id.*

■ Like the procedure the courts in this State have consistently followed in reviewing a claim of the violation of other constitutional rights, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.

Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. *Id.*

The Court observed that the object of an ineffectiveness claim is not to grade counsel's performances, and cautioned that the courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result. *Id.* at 2069–2070.

## II

*The Evidence Available to the State*

At 6:50 a.m. on Sunday, 9 August 1981, the Baltimore County Police Department received a telephone call which they characterized as a breaking and entering of The Sport-

man's Limited, a store in the vicinity of Reisterstown. The store sold hunting and fishing supplies and opened about 6:00 a.m. on weekends to accommodate fishermen. When the police arrived on the scene they found Conrad Hviding, the 22 year old son of the owner of the store, lying on the floor behind the counter. He had been shot and was dead. The glass in a showcase had been broken and glass fragments, some containing smears of blood, were scattered about. There were cartridge casings near the counter. Two witnesses came forward. Richard Holmes told the police that shortly before the robbery he went in the store to purchase a fishing license. Two black "boys" were in the store looking at guns in a showcase. Hviding was the only employee present. Holmes completed his purchase and left. Shortly thereafter George Lindley entered. The crime was in progress. He told the police that he saw two black males. One was kneeling behind the counter on his hands and knees reaching into a showcase. The other pointed a handgun at Lindley, ordered him to empty his pockets and lie on the floor face down, and stole his wallet containing twelve dollars. The robbers took a number of guns from the broken showcase, put them in a canvas bag and fled. Lindley called the police.

On 25 August 1981, Harris, 21 years of age and unemployed, was arrested for a theft from a J.C. Penney store. In his constructive possession was a handgun which had been stolen in the sports store robbery. The next day a police informant had a conversation on the street with Carl Brown, a 15 year old high school freshman. The informant was rigged with a concealed electronic device which enabled nearby police officers to overhear and record what was said. Brown admitted that he was a participant in the robbery and named Harris as another participant. He said, however, that there was a third person involved. He knew this person only as Bozie or Boxie or Box or "something like that." Brown did not know where Box lived. Persistent attempts by the informant to obtain a description of Box and more information about him elicited only vague gener-

alities. Brown told the informant that it was Box who shot Hviding.

Brown was arrested under the authority of a warrant. He told the State's Attorney for Baltimore County that it was Harris who had shot Hviding and gave a full statement regarding the robbery and murder. He entered into a plea bargain whereby he agreed "to cooperate with the State by truthfully and completely discussing the facts surrounding this murder ... [and to be] completely truthful and honest in relating what happened...." He further agreed "to testify in any proceeding where he is called upon to do so...."

The record indicates that the police placed Harris in a lineup. Lindley identified Harris as the person who had robbed him. Incident to Harris's arrest the police seized his shoes. Embedded in the laces were particles of glass. Federal Bureau of Investigation experts compared the particles with glass fragments from the broken showcase. Tests showed that the particles found in the laces of Harris's shoes were not inconsistent with the fragments from the broken showcase. Further tests established that the blood traces found on the fragments of glass from the showcase were not Hviding's blood type but did match that of Harris.[9] *See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Under authority of a search warrant the police searched Harris's home and recovered ammunition which matched cartridge casings found at the crime scene. Also under authority of a search

---

9. The judge at the evidentiary hearing on the motion to withdraw the guilty pleas found as a fact that a motion to suppress any evidence concerning the handgun seized at the time of Harris's arrest and the glass fragments found in the laces of Harris's shoes had been heard and denied. This finding was clearly erroneous. The motion to suppress this evidence was withdrawn by Russell under the tender of the guilty pleas. In any event, we see nothing in the record which would in any way support a grant of this motion had it gone to a hearing. It may be that the hearing judge confused this motion with a prior motion to suppress certain evidence which was heard and denied.

warrant, the police searched the residence of Brown and his mother and seized a number of the weapons stolen in the robbery of the sports store. Finally, although there can be no doubt of the cause of Hviding's death, the autopsy report confirmed that the cause of death was multiple gun shot wounds and that the manner of death was homicide. Hviding had been shot six times—once in the left chest, right arm, left back and right back, and twice in the right shoulder.

The evidence above summarized, when adduced by the State at a trial, would be sufficient in law, if believed, to prove, directly or by rational inference, beyond a reasonable doubt, the corpus delicti of each of the offenses charged and to establish Harris's criminal agency. With respect to the murder charge, it would be sufficient to establish that the murder was in the first degree, whether by a "wilful, deliberate and premeditated" killing or by a murder committed in the perpetration of the felony of robbery. Moreover, it subjected Harris to culpability as a principal in the first degree for both premeditated and felony murder.

### III

#### Harris's Allegations of Error

Harris could have been more definitive in satisfying his obligation to identify the specific errors made by Russell. In any event, we glean from his brief that his allegations of unreasonable professional conduct concern:

(a) The tender of the plea of guilty to first degree murder.

(b) The failure to limit the plea on the murder charge to felony murder.

(c) The failure to distinguish between a principal in the first degree and a principal in the second degree as to first degree murder.

(d) The content of the agreed statement of facts.

(e) The failure to make a full investigation.

(f) Russell's inexperience and burden of a heavy case load.

Since "[f]ailure [by Harris] to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim," *Strickland*, 104 S.Ct. at 2071, we shall assess allegations (a), (c), (d) and (e) initially under the deficiency component, and allegation (b) under the prejudice component. We shall dispose of Harris's claim that he was denied the effective assistance of counsel because of Russell's inexperience and heavy case load (allegation (f) *supra*) after we have evaluated Russell's performance under the other allegations.

We note preliminarily that Harris was afforded open discovery. Russell had complete access to the State's files and had inspected them and consulted with the prosecutors on several occasions. The record before us does not indicate that Russell was derelict in the general duties to consult with Harris on important decisions and to keep him informed of important developments in the course of the prosecution. *See Strickland* at 2065.

(a)

*The Tender of the Pleas of Guilty*

Harris alleges that the tender of the plea of guilty to first degree murder was unreasonable professional conduct on the part of Russell. We look to the circumstances surrounding the tender of the plea to determine the allegation. The compendium of those circumstances which we now set out is based in the main on findings of fact by the judge hearing the motion to withdraw the plea. There was evidence received at the hearing which supported the judge's factual findings, and we accept his findings as not clearly erroneous. What we quote in our recounting of the circumstances reflects the words of the judge.

Russell believed that Harris "was not incompetent. That he was a rather intelligent person." In negotiations with the State's Attorney Russell was told that "there would be no plea agreement, no plea bargain. In effect, that the

State's Attorney's Office was requiring unconditional surrender." The judge detailed the evidence available to the prosecution and observed that Russell believed that it was "pretty impressive." Russell thought it would be best to have the trial in another county. He filed a suggestion for removal and the case was removed to the Circuit Court for Kent County. At that time the plan of the defense was to have a full trial under pleas of not guilty.

At first Harris was not very cooperative. He "was nervous and . . . afraid, and . . . distrustful, and it was hard to deal with him." But Harris had "a change of heart. He had evidently undergone a religious experience, and he became more open with . . . Russell and told him everything [concerning the murder and robberies] *including admitting to being the triggerman.*" (Emphasis supplied). "[A]t that point the Defense was confronted with the intransigence of the State's Attorney, also the knowledge that [Harris] was indeed the triggerman and that there would be problems putting him on the stand or asserting anything in the way of an affirmative defense or even anything in the way of a negative defense, that is I didn't do it." With full knowledge of the State's case, gleaned from open discovery of State's file, Russell assessed the evidence against Harris as "overwhelming." Russell also "had misgivings about going to trial before an Eastern Shore jury and [having] the sentencing phase before an Eastern Shore judge. He felt that there might be a better advantage in going back to Baltimore County and having his client throw himself on the mercy of the Court. He felt there would be a home court advantage. That he knew the judge and that at that point no Baltimore County judge had imposed the death sentence." [10] Harris had exercised his absolute constitutional right of removal in order to have the

---

**10.** In *Strickland* at 2068 the Court recognized that such factors as the idiosyncrasies of a particular decisionmaker such as unusual propensities toward harshness or leniency may enter "into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry. . . ."

indictment transmitted to the Circuit Court for Kent County for trial. Constitution of Maryland, Art. IV, § 8(b). He sought the consent of the State to withdraw his original motion for removal so the case would revert to Baltimore County for trial. Harris, Russell and the prosecutors entered into an agreement as to the procedure for trial. The agreement was evidenced by a memorandum setting out that Harris would plead guilty, and that the decision to so plead was "made knowingly and intelligently after extensive consultation with [Russell] and with members of [Harris's] family." It further stated that Harris would enter the pleas of guilty "with the express understanding and knowledge that the State of Maryland intends to seek the death penalty" and that there was no "plea agreement whatsoever in regard to the disposition of the charges...."

The matter of the return of the case to Baltimore County was presented to Judge Rasin presiding in the Circuit Court for Kent County. The State told Judge Rasin that its consent to Harris's request to return the case was premised on the agreement as to trial procedure. Upon inquiry by Judge Rasin, Harris declared on the record that he and Russell had signed the agreement. Judge Rasin conducted a thorough examination of Harris in open court. Judge Rasin first ascertained Harris's age and educational background and that Harris wanted the case to be tried in Baltimore County. Upon probing inquiry by the judge, Harris explicitly acknowledged that he fully understood the terms of the agreement he had made and the effects of that agreement, namely that

he waived his right to a jury trial (the judge explained in detail the composition of a jury and its functions);

he was to enter pleas of guilty to the first degree murder and robbery of Hviding, the robbery of Lindley and the use of a handgun in the commission of a crime of violence;

upon conviction of murder in the first degree the penalty was death or life imprisonment;

in the event of a conviction of murder in the first degree, there would be a separate hearing before a jury or the court at his election to determine whether he would be executed or imprisoned for life. The judge explained the procedures to be followed at the hearing and what the trier of fact was to consider;

he did not think, either directly or through Russell, or any law enforcement officer or anyone else, that he had an agreement with the State concerning the disposition of his case, as to how the trial would take place or what the penalty would be;

no one had promised him anything and no one had told him, "This is what is going to take place, but don't tell anybody about it;"

he had all the opportunity he desired to discuss this procedure with Russell or anyone else he might wish to call on for advice in this situation;

he had no questions "about any of the proceedings up to this point" and he understood "what is going on today, and what procedure in the past has been."

Judge Rasin ordered that the case be returned to Baltimore County.

The judge hearing the motion to withdraw the plea found that the judge trying the case after its return to Baltimore County conducted in turn "an extremely thorough plea litany" of Harris at which Harris demonstrated that the plea was made "voluntarily, with understanding of the nature of the charge and the consequences of the plea." Rule 731c. He also found that Russell did not at any time guarantee that Harris would get a life sentence. The judge believed, under the totality of the circumstances, that Russell did no more than tell Harris that "your best shot is to plead guilty and put yourself on the mercy of the Court." The judge concluded:

In sum, Russell felt that the better chance would be to plead guilty, even if it were unconditional and he was unable to get any kind of bargain out of the State's

Attorney and throw [Harris] on the mercy of the Court than would be to go through a full scale trial. At this point, too, [Harris] wished to plead guilty. He wanted to get it over with, but of course, did not want the death penalty.

  *  *  *  *  *  *

Because of [Harris's] forthrightness, his youth and the remorse factor, which were brought out in sentencing, [Russell] made a judgmental call in which [Harris] apparently concurred that the lesser of two evils would be to go forth with an unconditional plea and take his chances with the Court.

We have made our independent constitutional appraisal from the entire record. In so doing we have reweighed the evidence in light of the factual findings of the hearing judge, in order to reach the ultimate question, namely whether as a matter of law Russell's representation was deficient with respect to the tender of the plea of guilty.

We eliminate from our consideration, as we must, the hindsight knowledge that the submission on a plea of guilty to first degree murder did not accomplish the result sought, that is, a life sentence and not the death penalty. We reconstruct the circumstances of Russell's concurrence in the plea of guilty from his perspective at the time. Harris wanted to plead guilty and fully understood the possible consequences. This was evidenced, not only upon a probing inquiry in open court by two judges on two occasions, but by a trial procedure agreement which he signed. Russell had made an informed assessment of Harris's situation based not only on the evidence available to the State but in the light of Harris's confession to Russell, which he never retracted, that he was, indeed, the one who fired the shots which killed Hviding. Russell concluded, as the hearing judge found, that a guilty plea afforded Harris the best chance to avoid the death penalty, which in the circumstances was the goal of the defense. We note that the tender of the guilty plea was not entirely void of recompense to

Harris. It paved the way for the return of the case for trial to Baltimore County, which was devoutly sought by Harris and Russell as in Harris's best interest. When we weigh all this in the light of the teachings of *Strickland*—the heavy burden of proof Harris must carry and the presumptions we must entertain—we find it clear that Russell concurred in Harris's desire to plead guilty in the exercise of reasonable professional judgment. In other words, Russell's assistance with respect to the tender of the guilty plea was reasonable considering all the circumstances. He made all significant decisions regarding the guilty plea in the exercise of reasonable professional judgment. In short, he was functioning as the "counsel" guaranteed Harris by the Sixth Amendment. We hold that Russell's performance was not deficient as to the tender of the plea of guilty.[11]

(b)

Harris alleges that Russell's failure to limit the plea to guilty of felony murder was unreasonable professional conduct.[12] We approach this allegation by way of the prejudice component.

It may be that a plea of guilty to murder committed in the perpetration of a robbery has a less adverse impact on

---

**11.** We note that in *McMann v. Richardson,* 397 U.S. 759, 770, 771, 90 S.Ct. 1441, 1448–49, 25 L.Ed.2d 763 (1970) the Court held that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases." *See also Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

**12.** We observed in *Harris v. State,* 295 Md. 329, 336, 455 A.2d 979 (1983) (Harris I) that "the record clearly demonstrates" that Harris "did not agree that he committed murder in a wilful, deliberate and premeditated manner...." At the guilt stage of the trial Russell indicated that the plea went only to felony murder. At the penalty stage he said, "I was very careful when we proceeded at the trial ... that we pled guilty to felony murder." Neither the trial court nor this Court agreed with him. Our view, like that of the trial court, was that Harris had pled guilty generally to murder in the first degree. *Harris I* at 337, 455 A.2d 979.

the trier of fact than a guilty plea to wilful, deliberate and premeditated murder. But even were this so, it would not, in itself, given the circumstances, constitute such prejudice, under *Strickland's* teachings, as would call on us to vacate the order denying the motion to withdraw the guilty plea. It seems that Russell's efforts to limit the plea to felony murder was bottomed on his belief that a death sentence was not authorized for that crime when the only aggravating circumstance was the underlying felony. He referred the trial court to *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), as supporting this view. At the time the guilty plea was tendered and accepted, the point had not been expressly determined by this Court. In any event, at the time Harris's motion to withdraw his plea of guilty to murder in the first degree was heard and denied, the death sentence now in effect had been imposed, and this Court had decided *Stebbing v. State*, 299 Md. 331, 473 A.2d 903 (1984). In *Stebbing* we declined to follow the holding in *State v. Cherry, supra.* We made clear that upon conviction of felony murder, a death sentence is permissible even though the only aggravating circumstance is the underlying felony if that circumstance outweighs the mitigating circumstances. *Stebbing* at 358–359, 473 A.2d 903. *See* Code, Art. 27, § 413(d)(10).

■ *Strickland* made clear that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the challenged judgment of a criminal proceeding if the error had no effect on the judgment." *Id.*, 104 S.Ct. at 2067. For this Court to vacate the order denying the motion to withdraw the plea, Harris must show that there is a reasonable probability that, but for Russell's failure to limit the plea to guilty of felony murder, the motion to withdraw the plea would have been granted. A reasonable probability under the circumstances of this case is a probability sufficient to undermine confidence in the propriety of the denial of the motion. *Id.* at 2068. Even if Russell had been successful in restricting Harris's guilty plea to felony murder, the denial of the motion would be proper. Under a

plea of guilty to felony murder Harris could have been convicted of murder in the first degree and the death sentence could have been imposed. The result could have been the same whether the plea was to felony murder only, as Russell intended, or to first degree murder generally, as was judicially determined. Thus, there is no reasonable probability that the motion to withdraw the plea would have been granted on the basis that the plea went only to felony murder. Harris did not meet his burden of showing that the decision reached would reasonably likely ·have been different absent the error specified. Harris did not, as *Strickland* requires, affirmatively prove prejudice. We hold that Russell did not, by reason of his failure to restrict the guilty plea to felony murder, deny Harris the right to the effective assistance of counsel guaranteed by the Sixth Amendment.

### (c)

Harris alleges that Russell's failure to explain the distinction between a principal in the first degree and a principal in the second degree as to first degree murder was unreasonable professional conduct. This insufficiency claim is prompted by Code, Art. 27, § 413(e)(1) which prescribes that only a principal in the first degree to murder in the first degree may be sentenced to death. *"A principal in the first degree* is one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent. *A principal in the second degree* is one who is guilty of felony by reason of having aided, counseled, commanded or encouraged the commission thereof in his presence, either actual or constructive." *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041 (1978). (Emphasis in original). If Harris was the one who fired the shots that killed Hviding he would be a principal in the first degree. If someone else fired the shots in Harris's presence, Harris

would be a principal in the second degree and not subject to the death penalty.[13]

██ We test this claim under the deficiency component. As we have seen, Harris voluntarily confessed to Russell that he had fired the shots that killed Hviding. He agreed to and signed a statement of facts to that effect. He did not indicate otherwise during two searching inquiries in open court on the voluntariness of his plea, one by the Circuit Court for Kent County and the other by the Circuit Court for Baltimore County. He had ample opportunity to recant to the courts before which he appeared, or to Russell, if his confession were false. We are not able to perceive, by reason or imagination, why, in the circumstances, he would lie about such a vital matter. This steadfast declaration established that he was a principal in the first degree to first degree murder. It follows that, as between Harris and Russell, there was no good reason for Russell to explain the distinction between a principal in the first degree and a principal in the second degree. In other words, Harris's admission of guilt to Russell is critical to a proper assessment of the fact that Russell did not clearly explain to Harris that distinction. Harris had given Russell cause to believe that, in any event, the distinction was of no moment. Therefore, the reasonableness of the failure to explain the law of criminal principals may be determined on what Harris had told Russell. When we evaluate the fact

---

**13.** At the hearing on the motion to withdraw the guilty plea, Harris testified that Russell had not explained the law concerning principals in the first degree and principals in the second degree. The hearing judge found this "a little hard to believe in view of the continuing emphasis on avoiding the death penalty...." The attorney representing Harris at the hearing asked Russell if he had "discuss[ed] the issues of first degree principal and any possible defenses to it that Mr. Harris might develop at a trial of guilt-innocence." Russell replied that he explained to Harris that "if he were at the scene and participated, he was a first degree participant." The judge's reaction to this colloquy was, "I find that that exchange doesn't tell me that Russell ever said that he didn't discuss with [Harris] the issue of whether or not [Harris] was the triggerman. The question is a little obscure and the answer seems a little obscure as well." The judge did not pursue the matter further.

that Russell did not discuss with Harris the principal in the first degree—principal in the second degree concept we believe that Russell's conduct was reasonable at the time. Russell had cause to rely on Harris's acceptance of responsibility for his crimes. It may be that Russell did not fully appreciate the significance of the distinction between a first degree and a second degree principal. But even so, this would not in itself render his conduct unreasonable. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation.... The purpose is simply that criminal defendants receive a fair trial." *Strickland*, 104 S.Ct. at 2065. We hold, with respect to allegation (c) that Harris did not meet his burden of showing that Russell's performance was deficient in the contemplation of *Strickland.*

(d)

*The Agreed Statement of Facts*

Harris alleges that Russell's agreement to the statement of facts as presented by the State constituted unreasonable professional conduct. We examine this allegation under the deficiency component.

The statement of facts established, beyond reasonable doubt, the corpus delicti of the first degree murder of Hviding and Harris's criminal agency as a principal in the first degree. At the guilt stage of the trial after the court had conducted the Rule 731 c. examination, the State offered the agreed statement of facts. It was signed by Harris, Russell and the two prosecutors. The State declared that "[t]he following facts are agreed to by [Harris], individually and through his attorney, G. Darrell Russell, and by the State ... as a true and accurate Statement of Facts regarding the murder of Stephen Hviding." The Statement was then read into the record. The court asked Harris if those were the facts that he had agreed to and Harris replied, "Yes, sir." Whereupon Russell informed the court that Harris desired to present additional facts not inconsistent with the Statement read into the record. Since

the State would not agree to the additions, Russell suggested that they be accepted after the verdict at the disposition hearing. The State had no objection to this, and the suggestions received the court's approval. In fact, the additions were received in evidence at the punishment stage of the trial. The additional facts proffered by Harris were that the co-defendant Carl Brown had planned the robbery and had recruited Harris and a youth known as Boxie to join in the commission of the crime. Boxie was to drive the getaway car. Boxie was known to Brown but Harris knew no more about him than that his nickname was "Boxie." Brown gave the weapons stolen in the robbery, including the murder gun, to his brother Robert Brown to sell on the street. The weapons which were not recovered by the police in Brown's residence had been sold. The proceeds of the sales were shared by Harris, the Browns and Boxie. The murder weapon came from Carl Brown, who had gotten it from his brother, Robert. When Harris and Carl Brown entered the store Brown gave the gun to Harris, and referring to the clerk, said, "He won't buck you, I know him." The ammunition found in Harris's house belonged to Harris's father who would testify that it was for the father's rifle. During the evening before the crime and during the early morning of the crime, Harris, Carl Brown and Boxie "drank two cases of beer, smoked several 'reefers' and then 'dropped a tab of acid.' " The Statement concluded,

And finally the defendant, Harris, is totally remorseful and willing to accept his just punishment and is thus entering his guilty plea and asking nothing in return, except equal protection of the law.

The additional facts presented by Harris, far from being in anyway inconsistent with the statement of facts prepared by the State, verified the accuracy of the State's version of the crime. The State's version was also supported by Harris's steadfast admission to Russell that he was the triggerman and by testimonial and physical evidence available to the State. We note that during the proceeding upon

the tender of the plea, the court informed Harris that if the case went to trial on a plea of not guilty the State "would have to prove that you are the one who committed the murder beyond a reasonable doubt." The court explained the meaning of "wilful," "deliberate," and "premeditated" and repeated, "[The State] would have to prove that you were the one who committed the murder beyond a reasonable doubt." Harris said that he understood.

■ On our independent appraisal, we do not believe that Russell's acceptance of the Statement of Facts was erroneous in light of the trial strategy adopted with the approval of Harris. In the circumstances, Russell's strategy was well within the range of professionally reasonable judgment. Harris did not meet his burden of showing that Russell's performance was deficient. Therefore, Harris received the assistance of counsel guaranteed by the Sixth Amendment.

(e)

Harris alleges that Russell's failure to make a full investigation before submitting on a plea of guilty constituted unreasonable professional conduct. We examine this claim under the first component, that counsel's performance was deficient.

*Strickland* declared that

counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. 104 S.Ct. at 2066.

The Court went on:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made

by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. *Id.* The Court gave an example:

"[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. *Id.*

"In short," the Court summed up, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Id.* at 2066–2067.

██    Harris urges that Russell's failure to make an investigation with respect to Boxie showed that Russell's assistance was ineffective. As we have seen, Boxie was the person Harris said was recruited by Brown to drive the getaway car. He was also identified by Brown in his conversation with the police informant as the person who fired the fatal shots. Brown, however, gave three different stories. After he told the informant that Boxie was the triggerman, he told the State's Attorney that the shots were fired by Harris, and, later, on the stand, he testified that he did not know who fired the shots. But the State's evidence pointed to only two robbers. Neither of the customers who entered the store at the time of the robbery indicated that there were more than two persons, other than the clerk, on the premises. The customer who was robbed at gunpoint identified Harris as the robber who had held the gun on him. The judge at the withdrawal of the plea hearing characterized Boxie as "some kind of a phantom" and concluded that "at the most, Boxie seems to have been the wheelman." On our direct assessment of the reason-

ableness under all the circumstances of Russell's decision not to conduct an investigation to find Boxie, we believe that the decision was based on information supplied by Harris and on informed strategic choices agreed to by Harris. We have repeatedly stressed the significance of Harris's confession to Russell, that he, Harris, was the triggerman, and the confession comes into play again as to the claim we now consider. The facts generally known to Russell because of what Harris had said eliminated the need for further investigation. In short, because Harris gave Russell cause to believe that pursuing an investigation of Boxie would be fruitless, adding nothing to the defense as planned, Harris cannot now challenge the failure to pursue the investigation as unreasonable. We conclude, applying the heavy measure of deference to Russell's judgment demanded by *Strickland,* 104 S.Ct. at 2066, that Russell's decision not to attempt to find Boxie did not constitute deficient conduct.

Harris also complains about Russell's failure to order a psychiatric examination and to talk to Harris's father. He relates this claim, however, to mitigating circumstances which are relevant to the imposition of the death sentence. The propriety of the death sentence is not before us on this appeal. *See Harris II,* 299 Md. at 519, 474 A.2d 890. We observe, however, that Harris had received a high school general equivalency degree and had obtained five college credits. There is nothing in the record to indicate that he was in any way not responsible for his criminal conduct at the time of the commission of the crime by reason of a mental disorder or mental retardation or that he was incompetent to stand trial. *See* Code (1982, 1984 Cum.Supp.) §§ 12–101 through 12–121 of the Health-General Article. Russell testified about his familiarity with Harris and his background:

> I knew that [Harris] had a previous armed robbery conviction—I knew his family background. I knew he had brothers in jail. I knew he had his GED. I knew he was a product of his background and environment.

Russell had spoken to Harris's mother by telephone three or four times and had arranged for both the mother and father to attend the sentencing proceeding. In fact they did not appear. Russell suggested a continuance to obtain their presence but Harris said, "Let's go ahead." Russell placed before the court by stipulation the evidence concerning the ownership of the ammunition found in Harris's home. Russell could expect, quite properly, that the presentence investigation which the Division of Parole and Probation was required to make in any case in which the death penalty is requested, *see* Code, Art. 41, § 124(d), would uncover all relevant information concerning Harris's history and background.

We find that Russell's performance with respect to Harris's investigation claim did not constitute unreasonable professional conduct and therefore was not deficient.

### (f)

Harris claims that he was denied the effective assistance of counsel because of Russell's inexperience and heavy case load.

*Strickland's* pronouncements regarding the burden on the defendant, which we have noted and emphasized a number of times *supra*, were stated in *Cronic*, 104 S.Ct. at 2046, in this way: "[B]ecause we presume that the lawyer is competent to provide the guiding hand that the defendant needs, ... the burden rests on the accused to demonstrate a constitutional violation." The presumption is not undermined by the fact that the defendant's lawyer is young or inexperienced. "Every experienced criminal defense attorney once tried his first criminal case. * * * The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation." *Cronic* at 2050. Furthermore, although the gravity of the charge, the complexity of the case, and the accessibility of witnesses "are all matters that may affect what a reasonably competent attorney could be expected to

have done under the circumstances, ... none identifies circumstances that in themselves make it unlikely that [the defendant] received the effective assistance of counsel." *Id.* at 2050–2051.

Russell was certainly not without any familiarity with the criminal law and was not without experience in the trial of criminal causes. We observe that in this case he filed and argued a number of pretrial motions such as for discovery, to produce documents, for severance, to suppress evidence and to change venue. It also appears from the record that Russell had discussed the case with his superior in the Office of the Public Defender for Baltimore County and that the manner in which he planned to try the cause, both as to tactics and strategy, met with the superior's approval.[14] Under the circumstances, we conclude on our evaluation of Russell's actual performance that his inexperience and workload,[15] such as they were, did not distort his professional judgment and did not render that performance deficient.

## IV

*The Evidence Proffered and the Evidence Adduced*

At the time of the first hearing on Harris's motion to withdraw his guilty pleas, the attorney then representing Harris was permitted to make a proffer of the evidence he sought to introduce in support of the motion. At the conclusion of the proffer, the trial judge ruled that he would not hear the proffered testimony because, in his view, he lacked authority to entertain the motion on its merits. (See "The History of the Case" portion of this

---

**14.** There was a conflict in the evidence as to whether the Deputy Public Defender for the State of Maryland approved of the trial procedure. But it appears from the record that the Public Defender of Maryland leaves control of a case accepted by a county Public Defender to that Public Defender.

**15.** There was evidence that Russell was handling about twenty cases a week.

opinion.) In *Harris II,* in vacating the order of the trial court denying the motion, we noticed the proffer and set out the substance of it as follows, *Harris II* [299 Md.] at 514–515, 474 A.2d 890:

1) Harris would testify that he pled guilty because Darrell Russell, his counsel in the prior proceeding, told him that if he continued to maintain his innocence and went to trial, he would receive the death penalty. According to the proffer, Harris would further testify that he believed that he was pleading guilty to felony murder only.

2) Russell would testify that he had come to realize that he had erred in urging his client to plead guilty. Russell would state that he improperly assessed the significance of a co-defendant's statement which named a third party as the actual killer of the victim. Russell would further testify that he had understood that his client was pleading guilty to felony murder only, that he had overestimated his power to convince the court not to impose death, and that he had inadequately prepared the case.

3) Harris's mother would testify that Russell had called Harris's home on two occasions to advise her that Harris should plead guilty to assure a life sentence and eventual parole.

We indicated that in the evidentiary hearing on the motion which we directed to be conducted on remand, the trial court was to make factual findings with respect to such evidence as was adduced in accordance with the proffer. The judge hearing the motion on remand did so. We find evidence in the record which supports his factual findings. We accept them as not clearly erroneous.

The judge found that the evidence presented did not measure up to the proffer. He was convinced that Harris was "at all times ... aware of his exposure to the death penalty...." Harris "wished to plead guilty. He wanted to get it over with, but of course, did not want the death penalty." The judge found as a fact that "Russell did not at any time guarantee that [Harris] would get a life sentence, although [Harris] and his mother ... testified to that

effect...." The judge did "not believe that under the totality of the circumstances that Russell did more than say that your best shot is to plead guilty and put yourself on the mercy of the Court." The judge thought, "Russell told [Harris] that he didn't have much of a chance either way, but probably the best chance he might have would be if he did just that."

The trial judge found that it was true that Harris believed that he was pleading guilty only to felony murder and that he did plead guilty to it, "but the Court accepted the plea on the basis that it didn't matter whether it was guilty of felony murder or first degree murder. Whatever it was, it was first degree, and the Court was going to view it as a first degree murder plea."

The judge did "not believe that Harris was ever told by his attorney that if he pled guilty he would be assured a life sentence and eventual parole." The judge observed that Russell did not testify that he had inadequately prepared the case. He did testify, the judge recalled, "that he was striving to get ... the Court to recognize that his client was pleading guilty to felony murder only, and he did feel that he had a chance but not a certainty to persuade the Court not to impose the death penalty."

The judge did not directly address the proffer that Russell would testify that "he had come to realize that he had erred in urging his client to plead guilty" and that "he improperly addressed the significance of the Co-defendant's statement which named a third party as the actual killer of the victim." Regardless, it is clear from our conclusions set out *supra* that such admissions, if made by Russell, would not be sufficient to establish that Harris was denied the effective assistance of counsel.

The judge at the hearing on the motion here under review found from the evidence that Russell

> was faced with a horrible dilemma. He made a choice. He discussed it with his client. His client agreed to it.

The client knew what was going on.... [H]e just happened to have guessed wrong.

The judge opined, "I don't think that's ineffectiveness of counsel." We agree.

## V

### *Summary and Holding*

We have made an independent constitutional appraisal of Harris's insufficiency of counsel claim on the totality of the circumstances as gleaned from the entire record. We have determined what those circumstances are from the factual findings accepted by us which were arrived at by the court below upon its judging of the credibility of the witnesses and its weighing of the evidence, from the undisputed facts and from the physical evidence before the court. We have evaluated each allegation of error in the light of the teachings of *Strickland* and *Cronic*. We have concluded, for the reasons we have set forth herein, that Russell's assistance was reasonable considering all the circumstances. That is to say, the purpose of the Sixth Amendment's effective assistance of counsel guarantee to ensure that criminal defendants receive a fair trial was not violated by Russell's performance as counsel for Harris. Harris did not meet his burden of showing that, on the particular facts of this case, Russell's representation was not within the range of competence demanded of attorneys in criminal cases. We so hold. The denial by the Circuit Court of Baltimore County of the motion to withdraw the guilty pleas is affirmed.

In view of our affirmance of the denial of the motion to withdraw the guilty pleas, all that remains to be done is for us to review the death sentence as we are required to do by Code, Art. 27, § 414(a). *See Harris II,* 299 Md. at 519, 474 A.2d 890. The parties shall submit such supplementary briefs on the issue as they may deem necessary pursuant to a schedule established by the Clerk of this Court, and we shall set the case for oral argument.

ORDER OF 27 JULY 1984 OF THE CIRCUIT COURT FOR BALTIMORE COUNTY DENYING HARRIS'S MOTION TO WITHDRAW HIS PLEAS OF GUILTY AFFIRMED; CASE TO REMAIN IN THE COURT OF APPEALS OF MARYLAND FOR FURTHER PROCEEDINGS PURSUANT TO THIS OPINION; COSTS TO BE PAID BY APPELLANT.

COLE, Judge, dissenting.

The Court holds in this case that defense counsel's representation of the defendant falls within the range of competence demanded of attorneys in criminal cases. Because I believe that trial counsel's performance here is a textbook example of ineffective assistance of counsel, I respectfully dissent.

I

The sixth amendment right to the assistance of counsel applies to the States through the due process clause of the fourteenth amendment. *See Argersinger v. Hamlin,* 407 U.S. 25, 30–33, 92 S.Ct. 2006, 2009–11, 32 L.Ed.2d 530, 534–36 (1972). This constitutional right to counsel protects the accused's fundamental right to a fair trial by requiring that counsel's assistance be *effective. See McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763, 773 n. 14 (1970). Recently, the Supreme Court considered the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to the Supreme Court, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. The *Washington* Court

went on to fashion a twofold test to analyze ineffective assistance of counsel claims.

A contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective consists of a performance and prejudice component. Under the performance component, the defendant must show that counsel's performance was deficient. Under the prejudice component, the defendant must show that the deficient performance prejudiced the defendant, i.e., deprived the defendant of a fair trial. With these preliminary observations in mind, I turn to the application of those components to the case *sub judice.*

## A.

To state the obvious, one of the main objectives of defense counsel in a capital case is to prevent the imposition of the death penalty on his client. Defense counsel may attain this objective through several means, such as acquittal of the underlying first degree murder charge, or, if the defendant is found guilty of that charge, through strategy geared toward the imposition of a life rather than a death sentence.

In this case, a defense predicated upon an acquittal of the first degree murder charge was not viable. The State had physical and testimonial evidence clearly establishing, beyond a reasonable doubt, that Harris was present at the murder scene. For instance, a robbery victim (Lindley) saw Harris there armed with a handgun; Harris's tennis shoes contained glass fragments that were consistent with the broken showcase glass; and blood found on the glass fragments at the sporting goods store was not inconsistent with Harris's blood. These facts should force the conclusion on any trained lawyer that the State could satisfy its burden of proving that Harris was guilty of first degree murder. These facts, however, do not compel the conclusion that Harris was a principal in the first degree rather

than a principal in the second degree. This distinction is of critical importance and forms the primary basis for my contention that Harris was denied the effective assistance of counsel guaranteed by the Constitution.

When a person is found guilty of murder, Maryland law directs that the court or jury that determined the person's guilt state in the verdict whether the person is guilty of murder in the first degree or murder in the second degree. Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 412(a). When the person is found guilty of first degree murder, a separate sentencing proceeding must be held to determine whether the person shall be sentenced to death or to life imprisonment, provided the State has given the notice required under § 412(b). *Id.* (1984 Cum.Supp.) § 413(a).

As this Court recently explained, "[i]n Maryland, one must be a principal in the first degree to first degree murder to be eligible for the death sentence." *Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1, 12 (1985); *see also Tichnell v. State,* 297 Md. 432, 444 n. 5, 468 A.2d 1, 7 n. 5 (1983), *cert. denied,* 466 U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). We based this conclusion on § 413(e)(1) of Art. 27, which defines "defendant" and "person" to "include only a principal in the first degree." Thus, a defendant is subject to the death penalty under § 413 when he falls within the definitional purview of a principal in the first degree, which this Court has defined as "one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent." *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041, 1046 (1978). By contrast, a principal in the second degree is not subject to the death penalty under § 413. A principal in the second degree is one who aids, counsels, commands, or encourages the commission of the crime in his presence. *See Johnson v. State, supra,* 303 Md. at 508, 495 A.2d at 12. An exception to the perpetrator requirement is the statutory provision that one who employs another to kill is a principal in the first degree under § 413. *See id.* at 508, 495 A.2d at 12 (citing Art. 27, § 413(e)(1); § 413(d)(7)).

With these distinctions in mind, it is important to understand that Harris had available to him a defense predicated upon the theory that he was a principal in the second degree. This defense was the only feasible one that stood between Harris and his exposure to the death penalty. More specifically, the State's entire theory that Harris was a principal in the first degree, and thus subject to the death penalty under § 413, rested upon the statements of a fifteen year old high school freshman, Carl Brown. Brown, who had accompanied Harris to the sporting goods store, gave two different versions of who was the triggerman, i.e., the principal in the first degree. Initially, Brown told a police informant that Harris did not shoot the victim. Later, after his arrest, Brown told the prosecutor that Harris was the shooter.[1] A closer examination of the circumstances under which Brown made the statements reveals that the latter statement was pregnant with bias and prejudice, and thus fertile for effective cross examination.

Less than a month after the August 9, 1981 murder, members of the Homicide, Narcotics, and Intelligence Sections of the Baltimore City Police Department surreptitiously monitored and recorded a conversation between a police informant and Brown. During the course of this hour long conversation, which transpired on a Baltimore City street, Brown stated that a person known only as "Bozie, Boxie[,] Box or something like that" was the shooter. Several portions of their conversation indicate that, from Brown's perspective, Harris was not the triggerman:

[INFORMANT]: Did Jackie [Harris] shoot him? Did Jackie shoot him?

BROWN: No.

---

1. Brown gave a third version as to who was the shooter at Harris's second sentencing proceeding, which was held in 1983. In response to the State's question as to who was the triggerman, Brown stated, "I'm not sure. I can't really say." Because this proceeding occurred after Harris's tender of the guilty plea in early 1982, and thus after Russell's representation of Harris, I disregard this version of the shooting as recounted by Brown.

[INFORMANT]: Oh, well it was on you then?

BROWN: No, there was one other person that was with us, right?

[INFORMANT]: Oh, what happened to him?

BROWN: He ain't, he ain't gonna get in no trouble.

[INFORMANT]: Young boy?

BROWN: Yeah.

[INFORMANT]: Oh, there was three of you all in the store?

BROWN: Uh huh.

[INFORMANT]: You, Jackie and another boy?

BROWN: Yeah, 'cause see

[INFORMANT]: He was the trigger man?

BROWN: Yeah.

[INFORMANT]: Oh, man (inaudible) do you want a cigarette?

\* \* \* \* \* \*

[INFORMANT]: Ummm. So the thing was on you, Jackie and the other boy?

BROWN: Ummm hmmm

[INFORMANT]: Young boy?

BROWN: Yeah.

After this conversation, Brown departed for a few moments. During this interlude, a detective approached the informant and told him to get more detailed information concerning the triggerman. Upon Brown's return, the informant attempted to do so by suggesting that police had previously shown the informant a list of names, and that the informant wanted to be able to see whether the triggerman's name was on that list:

[INFORMANT]: Then they had this whole list of names and shit, right. They had me go down this whole list of names. Keith, this, Kevin this, right? And Mark this, right? What's the boy's name? What's the boy's whole name? 'Cause I don't know the boy, right?

BROWN: The boy that was with me?

[INFORMANT]: Yeah, I don't know him, right?

BROWN: No, I don't even know his whole name. I just know him, you know[.]

[INFORMANT]: What's his first name, 'cause they might got his, they might got his real name that was on that list.

BROWN: Ummm.

[INFORMANT]: If you know his real name then I could remember[.]

BROWN: I don't know the nigger's real name. I ain't never heard nobody call him his real name I don't, he ain't even from up here.

[INFORMANT]: They had nicknames too but they were in parentheses.

BROWN: Yeah.

[INFORMANT]: And the nigger's real name, right? What's his nickname?

BROWN: Bozie, Boxie. Box or something like that.

[INFORMANT]: What did you call him?

BROWN: I call him Box. I heard everybody else calling him Boxie or Box, right?

[INFORMANT]: Where does he live at? I mean, he don't live in town?

BROWN: No, he lives in Baltimore somewhere. The nigger thinks he's slick.

[INFORMANT]: How old is he about?

BROWN: About 16, 17.

After Brown described other physical characteristics of Boxie, the conversation turned to Harris once more:

[INFORMANT]: Oh, so you had Jackie do it and the other boy.

BROWN: Yeah.

[INFORMANT]: Ah, damn. Then you're the set up man.

BROWN: Un huh.

[INFORMANT]: And Jackie just went with you and did it and the other boy did the shooting, huh?

BROWN: Jackie was just there.

Shortly thereafter, police arrested Brown pursuant to an arrest warrant. In November, 1981, after Brown met with prosecutors and told them that Harris was the triggerman, Brown and the State entered into a plea agreement under which Brown tendered a guilty plea to first degree murder in exchange for several benefits. First, the State agreed to nol pros the remaining counts with which Brown was charged. Second, the State promised to inform the court of Brown's actions and conduct after the entry of the guilty plea. Third, the State agreed that Brown was ineligible for the death penalty. Fourth, and finally, the State promised that upon Brown's incarceration, it would recommend that Brown not be housed in the same institution with Harris. Under these circumstances Brown, with only a life sentence, would be eligible for parole in less than twelve years.

Russell evidently failed to grasp the significance of Brown's inconsistent statement on such a vitally important matter. Through proper cross examination of Brown, Russell could have delved into Brown's various stories for the purpose of impeachment. As the Supreme Court remarked, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974). In a case where a witness changes his version of the events surrounding the commission of the crime under a plea bargaining agreement, as here, it is obvious that the witness's version may have been influenced by a promise, hope, or expectation of leniency with respect to the case as a consideration for testifying against the defendant. By contrast, the version of the crime given to an acquaintance during a casual conversation on a city street bears all of the hallmarks of trustworthiness. In that situation, the witness is not subject to the coercive pressures that inhere in the plea bargaining process, and has no obvious reason to tailor his version of the crime to comport with a particular prosecution theory. Between a version related to an acquain-

tance and that given to a prosecutor and his colleagues pursuant to a plea agreement, there is no question that the former bears more indicia of trustworthiness than the latter.

Other than Harris, Brown was the sole available witness who could testify as to who was the triggerman. Given Brown's gross equivocations on this issue, his testimony that Harris was the shooter could have been considerably discredited by defense counsel by virtue of relentless cross examination. Russell could have very easily brought to the fore that Brown changed his story at the same time he accepted a favorable plea agreement. Such testimony would make it difficult for the State to prove that Harris was in fact a principal in the first degree to this first degree murder.

As I see it, Russell failed to recognize this viable defense theory for the reason that he was unaware of the distinction between a principal in the first degree and a principal in the second degree and the consequences associated with that distinction. When Russell was asked at the evidentiary hearing on the competency of counsel issue as to whether he discussed "the issues of first degree principal and any possible defenses to it that Mr. Harris might develop at a trial of guilt-innocence," Russell responded that:

We, as I told you before Mr. Saunders, I did explain to Jackie [Harris] that if he were at the scene and participated, he was a first degree participant.

This was an erroneous statement of the law. Russell's misperception of the critical distinction that lies between a principal in the first degree and a principal in the second degree in the context of capital cases, together with his acceptance of a devastating Agreed Statement of Facts in which Harris admitted to being a principal in the first degree, directly led to the waiver of his right to argue this issue before the sentencer. Russell's "tactics" left Harris defenseless before the sentencer, while Russell prayed for a compassionate judge.

The majority places undue emphasis on Harris's confession to Russell that he, Harris, had shot the victim. Evidently, Russell believed that he would violate some ethical standard by tendering a not guilty plea and forcing the State to its proof. For instance, Russell testified that he saw no need to put the State to its burden of proving Harris guilty beyond a reasonable doubt because Russell knew that Harris was the triggerman:

Well, I knew that I could use [the body wire] to cross-examine Carl Brown, but Judge, the key is I knew where the truth was. You know, you draw a line between gamesmanship and pursuing the truth, and I think the greatest service you can perform to the Court is to present and to help them find justice through truth. That would have just been a game. Whenever I have pursued games, knowing that wasn't where the truth was, in the end it hasn't worked. I don't live my life that way. I don't practice law that way.

What Russell never understood, however, was that he sacrificed no honor and violated no ethical standards by challenging the State's proof of who was the shooter through rigorous cross examination of Carl Brown. This was not a case where the defendant intended to take the stand and perjure himself, nor was this a case where Russell had to produce exculpatory witnesses. Russell had only to use a good lawyer's most potent weapon—cross examination—to destroy the credibility of an accomplice who had given two versions of who was the shooter and who had ultimately accepted a deal in exchange for testifying against Harris. That Harris confessed to Russell to being the triggerman in the murder played no part in fulfilling Russell's foremost duty to advocate vigorously his client's cause and Russell's conceded goal of avoiding the death penalty for his client.

In sum, it is clear to me that Russell's representation of Harris fell below an objective standard of reasonableness and was outside the wide range of professionally competent assistance. First, Russell failed to recognize a viable defense because of his ignorance of the distinction between a

principal in the first degree and a principal in the second degree and that only the former is subject to the death penalty. Second, and related to the above, Russell encouraged his client, a criminal defendant against whom the State sought the death penalty, to plead guilty to first degree murder as a principal in the first degree without first exacting some meaningful *quid pro quo* from the State. More to the point, it is beyond my comprehension that defense counsel would pursue this course without obtaining a promise from the State to withdraw its notice of intent to seek the death penalty. If the State refuses to do so, it is a mark of inexperience and plain ineptitude for defense counsel not to force the State to its proof. After all, the defendant has nothing to lose in that situation. Third, and finally, Russell failed to advocate his client's cause with the zeal and vigor demanded by our Code of Professional Responsibility. This primary duty of counsel, together with the related duties of exercising skill and knowledge, serve to render the trial a reliable adversarial testing process. But that process is entirely compromised when counsel, dumbfounded and confused when his client confesses to him, elects to capitulate unconditionally. This defeatist strategy is no strategy at all. In my view, therefore, Harris has made the requisite showing of deficient performance by Russell in accordance with the performance component of the *Washington* test. I now turn my attention to the prejudice component.

### B.

The *Washington* test demands that the defendant show that the deficient performance prejudiced the defense. As Justice O'Connor explained in *Washington*, "[t]his requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington, supra,* 466 U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The Court went on to formulate the test in the following terms: "The defendant must show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

In my view, Harris would have never entered the guilty plea had Russell correctly explained the law governing principals in the first and second degree. In accordance with a proper recognition of this law, Russell should have put the State to its proof and subjected Brown to cross examination. In so doing, Russell would have set the stage for arguing that Harris was not subject to the death penalty because the State had not established that he was a principal in the first degree. By capitulating to the State's damning version of the facts, Russell forfeited his ability to argue this critically important issue. As a result, there is a reasonable probability that the result of the proceeding would have been different. Harris has, in my judgment, affirmatively proved prejudice which denied him the effective assistance of counsel guaranteed by the sixth and fourteenth amendments.

I respectfully dissent.

I am authorized to state that Judge ELDRIDGE concurs in the views here expressed.